## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| Tracy Lumley, | ) | **ORDER RE: CROSS MOTIONS FOR** |
| Plaintiff, | ) | **SUMMARY JUDGMENT** |
| | ) | |
| vs. | ) | |
| Social Security Administration, | ) | Case No. 1:18-cv-202 |
| Defendant. | ) | |

Plaintiff Tracy Lumley seeks judicial review of the Social Security Commissioner's denial of his application for disability insurance benefits. Before the court are competing motions for summary judgment filed by Lumley and the Social Security Administration. (Doc. Nos. 17, 20). This court reviews the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## I.     BACKGROUND

### A.     Procedural History

Lumley first filed a claim for disability on June 12, 2015, alleging a disability onset date of May 1, 2007. See Doc. No. 10-4, p. 3. He alleged the presence of three conditions that kept him from working: "Back injury," "breathing issues," and "memory issues." See id.

Lumley's claim was initially denied on December 28, 2015. See id. at 13. He applied for reconsideration on March 29, 2016, and the denial was affirmed on May 16, 2016. See Doc. No. 10-4, p. 40. Lumley requested a hearing before an Administrative Law Judge on July 21, 2016. See Doc. No.  10-5, p. 17-18.

The hearing was held on September 27, 2017, before Administrative Law Judge Michael

1

N. Balter. See generally Doc. No. 10-3, pp. 2-42. Present at the hearing were Lumley and attorney Paul A. Temanson on his behalf. See id. Vocational expert Warran Haagenson and Lumley's mother, Linda Lumley, also testified. See id.

On January 25, 2018, the ALJ issued his decision denying Lumley's claim for benefits. See Doc. No. 10-2, p. 30-42. On February 26, 2018, Lumley filed a request for review of the ALJ's decision. See Doc. No. 10-5, p. 36. At this time, he submitted additional medical records. See Doc. No. 10-2, p. 11-26. His request for review was denied by the Appeals Council on August 13, 2018. See Doc. No. 10-2, p. 2.

Lumley initiated the instant action by filing a Complaint on October 11, 2018. (Doc. No. 1). He filed the instant Motion for Summary Judgment on April 1, 2019, and the Social Security Administration filed its Motion for Summary Judgment on May 1, 2019. (Doc. Nos. 17, 20). The motions are briefed and ripe for the Court's review.

**B.    Personal History**

Lumley was born on August 17, 1967, making him thirty-nine years old on the alleged onset date. See Doc. No. 10-4, p. 2. He has a high school education and served in the National Guard. See Doc. No. 10-3, p. 8-9. His alleged disability onset date is May 1, 2007, but he last worked in the first quarter of 2008 for Patterson UTI Drilling. See id. His past work was in the oil fields. See id.

**C.    Medical History**

The medical records in this case range from June 2007 to November 2017. See generally Doc. Nos. 10-8, 10-9, 10-10. Lumley claimed three medical conditions caused his disability: back pain, breathing difficulties, and memory issues. The medical records most pertinent to these

issues are outlined here in summary fashion. The substance of the records is discussed in more detail in Section III, "Analysis".

A variety of other medical records were provided and reviewed by the undersigned, e.g., notes from a visit for an ear infection (Doc. No. 10-8, p. 16). These are ultimately irrelevant to the disability issues in this case and are not discussed further.

### 1.      Records related to back pain.

Lumley's complaints of back pain stem from an injury that occurred at work in 2007. See Doc. No.  10-8, p. 9. In 2007, he reported to the emergency room some seven weeks after the injury, complaining of back pain. See id.

The following year, 2008, Lumley underwent MRIs in February and October of his thoracic and cervical spine. See Doc. No.  10-8, p. 8; see also Doc. No. 10-9, p. 2-3.

The next records relating to treatment for back pain after October 2008 date from February 2014. In February and March of that year, he had several appointments with Dr. Eric Belanger and Lori Klabunde, PA, for evaluation of thoracic pain. See Doc. No.  10-8, p. 30-35.

After March 2014, Lumley next sought treatment for his back pain in June 2015. Between June and October 2015, he sought care from Mortenson Chiropractic for a total of 11 visits. See Doc. No.  10-9, p. 65-77.

After October 2015, Lumley next treated for his back pain on March 17, 2017, when he consults Dr. Duk Kim, a neurologist. See Doc. No.  10-10, p. 59. Lumley has multiple appointments for back pain during the remainder of 2017 with different providers. He sees Dr. Promil Bhutani for a variety of issues, including back pain, on April 24, 2017. See Doc. No.  10-10, p. 25-27. He sees Patricia Richter, NP, for back pain on July 21, 2017. See Doc. No.  10-10,

p. 19-20. A letter from Dr. Ryan Clauson regarding an MRI of his cervical spine is dated September 14, 2017. See Doc. No.  10-10, p. 82-83. On November 8, 2017, Lumley visits Dr. Stephen Markewich for neck pain and thoracic pain and is referred to physical therapy. See Doc. No.  10-10, p. 75-79.

### 2.   Records related to breathing difficulties

The first mention of breathing-related symptoms in the medical record dates from October 22, 2014. See Doc. No.  10-9, p. 49. In a consultation for abdominal pain, Lumley mentions a cough that has been improving but worsens at night. See id.

On April 21, 2015, Lumley presents to Heidi Bender, FNP, for shortness of breath that he states has been going on for several years. See Doc. No.  10-9, p. 47. Lumley tells Bender that he previously had an appointment with the Trinity Health pulmonary clinic but that the clinic "lost it." Bender notes that the clinic was unable to find this record. See id. On December 18 of that year, Lumley underwent a pulmonary function evaluation. See Doc. No.  10-10, p. 3-4.

On April 24, 2017, Lumley visited Dr. Promil Bhutani for a variety of conditions, including breathing issues and inhaler use. See Doc. No.  10-10, p. 25-27. On September 25 of that year, he presents to the emergency room with complaints of difficulty breathing, coughing, and wheezing, with an onset of the day before. See Doc. No.  10-10, p. 8-12. He was diagnosed with dyspnea, chest pain, and an upper respiratory infection. See id.

In February 2018, Lumley visited a pulmonary clinic at Sanford Health in Bismarck and underwent a pulmonary function test. See Doc. No.  10-2, p. 12-26. He was diagnosed by Dr. Vikesh Gupta with underlying severe persistent asthma and his medications were adjusted. See id. at 21.

### 3.     Records related to memory issues

The first mention in the administrative record of memory issues is Lumley's consultative exam with Dr. Timothy Eaton on October 23, 2015. See Doc. No.  10-9, p. 82-84. On April 24, 2017, Lumley mentions difficulty focusing to Dr. Promil Bhutani. See Doc. No.  10-10, p. 25-27.

### 4.     Other medical conditions

A variety of other medical issues appear in the medical records. Some of these, like the treatment for an ear infection mentioned above, are for acute conditions. Others appear more consistently. These conditions include GERD, which was diagnosed via X-ray in 2012 and treated again in September 2014.  See Doc. No.  10-8, p. 57; see also Doc. No.  10-9, p. 35. Lumley also experiences abdominal pain, which he treats for several times in 2014. See Doc. No. 10-9, p. 44-56; see also Doc. No. 10-8, p. 36-37, 55. Lumley also experienced such conditions as appendicitis in 2013 and a kidney stone in 2016. See Doc. No.  10-9, p. 5-33; see Doc. No. 10-10, p. 62-69.

### D.     Administrative Hearing

On September 27, 2017, a hearing was held before Administrative Law Judge Michael N. Balter in Minot, North Dakota. See Doc. No. 10-3. Relevant testimony is summarized below.

Lumley testified that his chronic neck pain and trouble with concentration keep him from working. See id. at 12. He also stated that he has breathing issues and uses an inhaler. See id. at 13. He described back pain in his middle back, underneath his shoulder, that he experiences constantly at a level of five or six on a one-to-10 scale. See id. at 14. He takes medications and uses back supports, a roller, and an exercise ball. See id. at 14-15. His medications make him groggy. See id. Due to his pain and breathing issues, he only sleeps sporadically. See id.

Lumley testified that he could probably walk only about an eighth of a mile and could only maintain a standing or sitting position for 15 or 20 minutes. See id. at 16. He would have trouble picking up a 12-pack of soda. See id. at 17. He has no strength in his hands and also experiences numbness, weakness, tingling, and pain; he stated that he would probably not be able to use his hands for 30 minutes in a given hour. See id. He further testified that he is unable to concentrate for two hours consecutively. See id. at 18. He experiences stress and is not receiving any mental health treatment although he takes an antidepressant. See id. He testified that he has trouble remembering things like appointments. See id. at 19.

Lumley explained that when he worked in the oil fields, he had a back injury, but only received one injection as treatment. See id. at 20. He is pursuing further treatment through the VA. See id.

Lumley testified that he lived by himself. See id. at 22. He usually eats food that he prepares in the microwave. See id. at 23. On a typical day at home, he watches TV, takes naps, listens to music, and reads during the day although he has trouble making progress with books. See id. at 23-24. On a bad day he watches TV without sound and does not listen to music due to headaches. See id. at 24. He estimated that he experiences 10-20 bad days a month.

Lumley stated that he would not be able to keep to an employer's schedule and cannot get through a day without lying down. See id. at 25. He states that prior to 2008, the work he performed was heavy labor. See id.

Lumley's mother also testified at the hearing. She stated that she visits him two to three times a week. See id. at 28. She described his medical history. See id. at 28-30. She explained that Lumley is not able to keep his home clean or wash dishes. See id. She stated that he

experiences emotional distress due to his problems. See id. at 31.

Lumley's mother testified that he has trouble concentrating, and that his various conditions are worsening over the years. See id. at 31-32. He has trouble sitting for long periods of time, and is very uncomfortable. See id.

Vocational expert Warran Haagenson also testified at the hearing. The ALJ described a hypothetical scenario of a person limited to light work with other limitations, and asked Haagenson if that person could perform any of Lumley's past work. See id. at 34-35. Haagenson testified that he could not. Haagenson went on to describe some light, unskilled jobs that such a person could perform. See id. at 35-36. He explained that his testimony was partially consistent with the information of the Dictionary of Occupational Titles, and partially based on his 26 years' of experience as a vocational consultant. See id. at 36. The ALJ then presented another hypothetical, and Haagenson stated that such a person could perform the same jobs as previously cited. See id.

Haagenson testified that Lumley would not have skills that would transfer to light or sedentary work. See id. at 37. The ALJ then presented a third hypothetical with more limitations, and Haagenson testified that a range of sedentary work would fit into this hypothetical. See id. at 37-38. The ALJ presented a fourth hypothetical with the limitation that the person must alternate between sitting and standing every 15 minutes, and Haagenson testified that this condition would rule out competitive employment. See id. at 38. Haagenson went on to answer several specific questions from the ALJ and Lumley's attorney about allowances for being off task, failing to maintain concentration, unscheduled breaks, and absenteeism. See id. at 39-40.

Lastly, the ALJ explained that the record would be held open for further records, and

concluded the hearing. See id. at 40-41.

   E.   **ALJ's Decision**

On January 25, 2018, the ALJ issued his decision. See Doc. No. 10-2, pp. 30-42. He first noted that Lumley had acquired sufficient quarters of coverage to remain insured through December 31, 2018. See id. at 30. He then recited the applicable law, outlining the five-step sequential evaluation necessary for adjudicating disability under the Social Security Act. See id. at 31-32.

The ALJ then proceeded to make findings of fact and conclusions of law. He found that, despite Lumley's alleged onset date of May 1, 2007, Lumley had indeed engaged in substantial gainful activity from May 1, 2007[1] through April 1, 2008. See id. at 32. The ALJ noted other income from 2008-2013, but accepted Lumley's reports that these earnings were passive income from a farm. See id. As such, he concluded that the earliest date disability could be established was April 1, 2008. See id. at 33.

The ALJ found the following severe impairments: a back disorder, chronic obstructive pulmonary disease, and obesity. See id.

The ALJ also noted other conditions, such as a kidney cyst and gastroesophageal reflux disease, but found they had no more than a minimal impact on Lumley's ability to carry out work-related activities. See id. He also noted the diagnosis of somatic symptoms disorder, but cited the State agency psychological consultants' reports as well as other record evidence in analyzing this disorder according to the relevant regulations to find that it was non-severe. See

---

   [1] In discussing this matter, the ALJ initially wrote "May 1, *2017*" rather than "May 1, 2007," but it is clear from context that this was a typographical error.

id.

The ALJ next found that Lumley does not have an impairment or combination thereof that met or medically equaled the severity of a listed impairment. See id. at 34-35.

Then, the ALJ found that Lumley had the residual functional capacity ("RFC") to perform less than the full range of light work with certain limitations, which he details. See id. at 35. In explaining his RFC determination, the ALJ first discussed Lumley's reports of functional limitations and summarized his hearing testimony. See id. at 35-36. He finds that, while Lumley's medically determinable impairments could reasonably be expected to cause the alleged symptoms, his statements concerning their limiting effects were not entirely consistent with the evidence. See id. at 36.

The ALJ then recounted the medical evidence related to Lumley's back issues and breathing difficulties from 2008 through 2017, concluding that Lumley's "sporadic treatment and the minimal diagnostic findings as well as the physical examination observations in the record support a finding for a range of light work activity." See id. at 37. The ALJ also addressed Lumley's obesity, stating that it could reasonably be expected to aggravate his symptoms caused by other impairments and incorporating it into his RFC determination. See id. at 37-38. The ALJ further discussed the medical evidence, noting some difficulties upon physical examination but also some normal findings. See id. at 38.

Specifically addressing Lumley's claims of COPD, the ALJ explained that while the results of a December 2015 pulmonary test were questionable, he limited the RFC determination based on Lumley's subjective complaints. See id. Turning to Lumley's somatic pain disorder which was previously found non-severe, the ALJ acknowledged that while Lumley did complain

of pain, his records showed normal strength and range of motion and contained what the ALJ characterized as "editorial comments." See id. The ALJ stated that considered the complaints associated with the somatic disorder within the physical aspects of his RFC assessment. See id.

Addressing Lumley's activities of daily living, the ALJ noted that they are somewhat limited, but support a reduced range of light work activity. See id. Looking to his earnings history, the ALJ noted that he did earn substantial income from 1999 to 2008, but the "probative weight" of this positive history "is eroded by the limited treatment in the record and minimal diagnostic findings in the record" as well as Lumley's failure to look for other "reduced exertional" work. See id.

The ALJ also discussed the testimony and functional report from Linda Lumley, claimant's mother, and explained that he gave her statements "limited weight to they extent they support the limitations" in the RFC. See id. at 38-39.

The ALJ next addressed the statements of various state consultative examiners. He states that Dr. Eaton, the psychological consultative examiner, is an acceptable examining medical source. He gave Dr. Eaton's conclusions – that Lumley's memory deterioration was within the average range, with a lack of vocational limitations related to cognitive functioning – great weight, finding them consistent with testing, Lumley's activities of daily living, and lack of mental health treatment. See id. at 39. The ALJ affords some weight to the state agency consultants' assessments, disagreeing with one of their opinions which stated that Lumley is limited to only two hours of standing or walking. The ALJ based his disagreement on Lumley's testimony and stable COPD symptoms. See id. The ALJ further affords great weigh to the state agency psychological consultants' conclusions that Lumley's mental conditions are not severe.

See id. at 39-40.

Overall, the ALJ found that his RFC assessment was supported by the longitudinal record. See id. at 40. He explains that Lumley complained intermittently of back pain over the years, but his treatment was sporadic and conservative, with some degenerative changes documented in a recent MRI. See id. at 40. Otherwise, his treatment remained conservative and his symptoms remained stable, with only some limitations on his activities of daily living. See id. As such, the ALJ concluded, he has the RFC to perform less than the full range of light work activity with the other limitations described. See id.

Next, the ALJ found that Lumley was unable to perform any of his past relevant work, based on the testimony of the vocational expert. See id. He then noted that Lumley was 39 years old on the alleged disability onset date, but his age category subsequently changed to "closely approaching advanced age." See id. He noted Lumley's high school education and ability to communicate in English. See id.

The ALJ found that considering Lumley's age, education, work experience, and RFC, there are jobs in significant numbers in the national economy that Lumley can perform, citing the vocational expert's testimony. See id. at 41. As such, the ALJ concluded that Lumley has not been under a disability from May 1, 2007, through the date of his decision.

## II.     APPLICABLE LAW

### A.     Law Governing Eligibility for Disability Benefits

A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less

than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505, 416.905. A claimant has a disability when they are not only unable to do their previous work, but cannot—considering age, education, and work experience—engage in any other kind of substantial gainful work which exists in significant numbers in the region where they live or in several regions across the country. 42 U.S.C. §§ 423(d)(2)(a), 1382a(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520, 416.920; see Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007). First, the Commissioner considers the claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the Commissioner moves onto step two.

At step two, the Commissioner determines "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." Dixon v. Barnhart, 353 F.3d 602, 605 (8th Cir. 2003). The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b). Abilities and aptitudes includes: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. Id.; see also Bowen v. Yuckert, 482 U.S. 137 (1987). "The sequential evaluation process may be terminated at step

two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [their] ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner considers the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d); see Kelley v. Callahan, 133 F.3d 583, 588 (8th Cir. 1998). If the claimant's impairment is severe, but does not meet or equal one of the presumptively disabling impairments, then the Commissioner will determine the claimant's residual functional capacity ("RFC"). 20 C.F.R.§§ 404.1520(a)(4((iv), 404.1545(a)(4), 416.920(a)(4)(iv), 416.945(a)(4). To determine a claimant's RFC, the Commissioner examines the claimant's physical abilities to work. See Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003).

At step four, the Commission examines medical and non-medical evidence in determining if the claimant has the RFC to perform past relevant work. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).

At step five, if the claimant does not have the RFC to perform past relevant work, the Commissioner then has the burden to show there is other work the claimant can still do. See Bladow v. Apfel, 205 F.3d 356, 358–59 n. 5 (8th Cir. 2000). If the Commissioner determines the claimant has the RFC to perform some work, the Commissioner must then show that the work claimant is able to do exists in significant numbers in the national economy. Eichelberger v.

Barnhart, 390 F.3d 584, 591 (8th Cir. 2004).

**B.      Standard of review**

Upon review of the entire record, the court can affirm, modify, or reverse the decision of the Commissioner, with or without remanding the case for rehearing. 42 U.S.C. § 405(g). To affirm the Commissioner's decision, the court must find that substantial evidence appearing in the record as a whole supports the decision. See id.; Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989).

Substantial evidence is "less than a preponderance of the evidence and is such relevant evidence as a reasonable mind would find adequate to support the Commissioner's conclusion.'" Igo v. Colvin, 839 F.3d 724, 728 (8th Cir. 2016), citing Blackburn v. Colvin, 761 F.3d 853, 858 (8th Cir. 2014) (internal quotation marks omitted). The threshold for evidentiary sufficiency under the substantial evidence standard "is not high." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019). "It means—and means only— such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Biestek, 139 S. Ct. at 1154 (2019) (quotation omitted) citing Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206 (1938). A court may not reverse simply because it would have reached a different conclusion, or because substantial evidence supports a contrary conclusion. Igo, 839 F.3d at 728.

The court may disturb an ALJ's decision only if the decision lies outside the available "zone of choice." Nicola v. Astrue, 480 F.3d 885, 886 (8th Cir. 2007), citing Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir. 2006). An ALJ's decision is not outside the "zone of choice" simply because a court might have reached a different result had it been the initial trier of fact. Id.

III.    **ANALYSIS**

Lumley's complaints fall into several categories. Several of these constitute attacks on the ALJ's RFC determination. His most substantial criticisms in this respect seem to be that the ALJ improperly discounted Lumley's subjective complaints and that the ALJ failed to properly develop the medical record.  Lastly, Lumley asserts that he is disabled pursuant to GRID Rule § 201.12, and incorporates into this criticism a claim that the ALJ's hypothetical questions to the vocational expert were improper. These three claims are considered sequentially below.

A.    **Whether the ALJ improperly discounted Lumley's subjective complaints**

1.    **Arguments of the parties**.

Lumley argues generally that "the ALJ's apparent reasons for discounting Lumley's testimony are not supported by the records as a whole." (Doc. No. 18, p. 6).

The Commissioner responds at length, arguing that substantial evidence supports the ALJ's conclusions regarding subjective complaints. Noting first that a reviewing court should not reweigh evidence, the Commissioner contends that the ALJ properly considered all relevant factors consistent with governing law. The Commissioner further notes specific weaknesses in Lumley's case, such as his failure to seek regular and continuing treatment, his need for only conservative treatment, his medical records showing average memory results, lack of acute distress, and normal ranges of motion, and his performance of several activities of daily living. The Commissioner argues that the presence of these inconsistencies justifies the ALJ's discounting of Lumley's subjective complaints.

**2.      Governing law**

The law governing this particular issue has been revised in recent years, but the changes are more of style than substance. As noted by the Commissioner, Social Security Ruling 16-3p (applicable to decisions issued on or after March 28, 2016) eliminates usage of the term "credibility." <u>See</u> Soc. Sec. Ruling 16-3p Titles II & XVI: Evaluation of Symptoms in Disability Claims, SSR 16-3P (Oct. 25, 2017), available at 2017 WL 5180304. However, this Ruling "largely changes terminology rather than the substantive analysis to be applied." <u>Lawrence v. Saul</u>, 970 F.3d 989, 995 (8th Cir. 2020), n. 6. As with the previously-applicable Ruling, SSR 16–3p incorporates 20 C.F.R. § 404.1529(c)(3), which provides factors for an ALJ to use when assessing a claimant's allegations. <u>Perfater v. Berryhill</u>, 2018 WL 3037427, at *4 (W.D. Mo. June 19, 2018).

As such, an ALJ must consider a variety of factors when evaluating a claimant's subjective complaints.

> When evaluating a claimant's subjective complaints of pain, the ALJ must consider objective medical evidence, the claimant's work history, and other evidence relating to (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; and (5) the claimant's functional restrictions.

<u>Schwandt v. Berryhill</u>, 926 F.3d 1004, 1012 (8th Cir. 2019), citing <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984) 20 C.F.R. § 404.1529(c). The five numbered factors are often referred to as "Polaski factors." <u>See</u>, e.g., <u>Buckner v. Astrue</u>, 646 F.3d 549, 558 (8th Cir. 2011).

If "the evidence as a whole is inconsistent with the claimant's testimony," then the ALJ may decline to credit a claimant's subjective complaints. <u>Julin v. Colvin</u>, 826 F.3d 1082, 1086

(8th Cir. 2016), quoting <u>Guilliams v. Barnhart</u>, 393 F.3d 798, 801 (8th Cir. 2005). A court defers to an ALJ on this issue "as long as good reasons and substantial evidence support the ALJ's evaluation of credibility." <u>Nash v. Commissioner, Soc. Sec. Admin.</u>, 907 F.3d 1086, 1090 (8th Cir. 2018), citing <u>Julin</u>, 826 F.3d at 1086.

### 3.     Analysis

As noted above, the ALJ opined that Lumley's subjective statements "concerning the intensity, persistence, and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record." <u>See</u> Doc. No.  10-2, p. 36. The question for this Court, pursuant to the law cited above, is whether this assessment of Lumley's subjective complaints is supported by substantial evidence. The below analysis will track the factors cited in <u>Schwandt</u>, above: first, objective medical evidence; second, Lumley's work history, and third, the <u>Polaski</u> factors.

### a.     The objective medical evidence

The ALJ's analysis of the objective medical evidence spans several pages and outlines Lumley's treatment history in detail. In analyzing the medical record, the ALJ draws several conclusions. For instance, regarding Lumley's back pain, the ALJ notes that his "sporadic treatment and the minimal diagnostic findings as well as the physical examination observations in the record support a finding for a range of light work activity." <u>Id.</u> at 37.

Overall, the undersigned finds that the ALJ's findings regarding the objective medical evidence are supported by substantial evidence. The sporadic nature of Lumley's treatment is particularly striking. He alleges a disability onset date of May 1, 2007. He apparently seeks

17

treatment for back pain once in 2007 and undergoes two MRIs in 2008. See Doc. No. 10-8, p. 9; Doc. No. 10-8, p. 8; Doc. No. 10-9, p. 2-3.

Yet after October 2008, over five years elapse until Lumley next seeks treatment for back pain. In February and March 2014, he has several appointments to address the condition; one provider in December of that year speculates that his abdominal pain may be coming from his back. See Doc. No. 10-8, p. 30-35; Doc. No. 10-8, p. 36. He next seeks treatment for his back pain in June 2015. See Doc. No. 10-9, p. 65-77. After his round of chiropractic treatment concludes in October 2015, there is yet another gap until March 2017. See Doc. No. 10-10, p. 59. For the remainder of 2017, he appears to seek treatment somewhat more regularly from a variety of providers. See Doc. No. 10-10, p. 59; Doc. No. 10-10, p. 25-27; Doc. No. 10-10, p. 19-20; Doc. No. 10-10, p. 82-83; Doc. No. 10-10, p. 75-79.

Lumley's treatment for his other conditions is similarly sporadic. No mention of any condition arguably related to breathing difficulties occurs until October 2014, seven years after the alleged onset date, when Lumley mentions a cough during a medical appointment. See Doc. No. 10-9, p. 49. In April 2015, he informs a provider, Heidi Bender, that his shortness of breath had lasted for years and that the pulmonary clinic had lost his appointment, but Bender writes that the clinic was unable to find this record. Two years later, Lumley addresses his breathing issues with Dr. Bhutani in April 2017 and presents to the emergency room the following September with difficulty breathing, cough, and wheezing. See Doc. No. 10-10, p. 25-27; p. 8-12. However, the provider at the ER visit writes "Prior episodes: occasional," and while noting Lumley's asthma and inhaler use, writes that the difficulty breathing started the night before. See Doc. No. 10-10, p. 8-12. In February 2018, Lumley visited a pulmonary clinic at Sanford Health

in Bismarck and underwent a pulmonary function test. See Doc. No. 10-2, p. 12-18. At that visit, he was diagnosed by Dr. Vikesh Gupta with underlying severe persistent asthma. See id. at 21.[2]

As for Lumley's allegations of memory issues, no mention of this issue occurs in the medical record apart from Lumley's participation in a consultative exam with Dr. Eaton in October 2015, and his complaining of difficulty focusing to Dr. Bhutani in April 2017. See Doc. No. 10-9, p. 82-84; See Doc. No. 10-10, p. 25-27.

Of course, the timing and frequency of treatment is not dispositive. Yet at the very least, the lengthy periods of time (spanning up to five years in the case of his back issues) without any attempt on Lumley's part to seek medical assistance do not bolster his claims of debilitating pain and extreme functional loss.

The ALJ also highlighted the minimal diagnostic findings made by Lumley's providers during those times he did seek care. For instance, radiologic studies frequently showed minimal findings during the relevant period: an MRI of the thoracic spine in February 2008 reported "no evidence of acute or subacute pathology in the thoracic spine," with no significant degenerative disease, disc herniation, or spinal stenosis; an MRI of the cervical spine performed on October 28, 2008, showed no evidence of significant cervical disc disease; an MRI of the thoracic spine performed on March 4, 2014, showed "mild multilevel degenerative changes of the thoracic spine with no obvious significant mass effect upon any of the nerve roots or the thoracic cord seen;" a chest X-ray performed on September 26, 2017, showed "mild degenerative changes of

---

[2] Notably, this final record was never before the ALJ; it was generated several months after the hearing. Lumley does not, however, mention this record in his brief.

the thoracic spine." <u>See</u> Doc. No. 10-8, p. 8; <u>See</u> Doc. No.  10-9, p. 3; <u>See</u> Doc. No.  10-8, p. 35; <u>See</u> Doc. No.  10-10, p. 11.

The only non-minimal showing on a diagnostic test occurred in the post-hearing submission. A letter dated September 14, 2017, from Dr. Ryan Clauson summarizes results of an MRI showing a "large amount of arthritis" in Lumley's neck and "significant narrowing" where the nerves exit the spinal column at the cervical level. <u>See</u> Doc. No.  10-10, p. 82-83. This evidence was submitted after the hearing. The ALJ explicitly acknowledges this evidence, but contrasts it with Lumley's physical examinations. <u>See</u> Doc. No.  10-2, p. 38.

Looking to the evidence in its entirety, it appears that the majority of radiological evidence, although certainly not all, shows only mild degenerative changes in Lumley's spine. The undersigned agrees with the ALJ that such relatively mild findings are not consistent with the severity of Lumley's reported symptoms.

In addition to noting the minimal diagnostic findings and intermittent nature of Lumley's medical care, the ALJ also notes the conservative nature of his treatment and some normal findings on physical exams. Without reciting the evidence at length, the Court finds that the ALJ's evaluation of this evidence is well-reasoned. Overall, the undersigned finds that the ALJ's conclusion – that Lumley's statements regarding his symptoms "are not entirely consistent with the medical evidence" – to be supported by substantial evidence on the record as a whole.

### b.     The ALJ's analysis of Lumley's work history

Next in the list of factors set forth in <u>Schwandt</u> is a claimant's work history. Here, the ALJ specifically considers this, writing that "review of [Lumley's] earnings records indicate the claimant earned income at substantial gainful activity levels on a fairly regular basis from 1998

to 2008." (Doc. No. 10-2, p. 38). However, the ALJ reasons that the "probative weight" of this positive history is "eroded by the limited treatment in the record and minimal diagnostic findings in the record as well as the claimant's lack of looking for any other reduced exertional work." Id. As stated above, the Court agrees with the ALJ's conclusions regarding the medical evidence in this case and finds this is a fair analysis of the "work history" factor.

### c.      The ALJ's analysis of the Polaski factors

In the last portion of his evaluation of Lumley's subjective complaints, the ALJ must analyze (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; and (5) the claimant's functional restrictions. Notably, the ALJ need not explicitly discuss each Polaski factor nor specifically cite Polaski. Buckner, 646 F.3d at 558 (citations omitted).

Regarding the first factor, the ALJ writes that he has "considered the claimant's activities of daily living." Doc. No. 10-2 at p. 38. He cites Lumley's function report, explaining that he has some difficulties, but was able to complete activities such as light chores, driving, shopping, managing finances, etc. While admitting that these activities are "reduced," the ALJ finds them supportive of a reduced range of light work activity.

Moving to the next three factors, the ALJ does not explicitly analyze "duration, frequency, and intensity of the pain," "participating and aggravating factors," or "dosage, effectiveness, and side effects of medication," in separate sections of his opinion. Rather, he integrates discussion of these factors into his general analysis of the evidence. See id. at p. 35-40. The undersigned notes that this organization is sufficient; as above, the ALJ need not explicitly

discuss each factor. <u>Buckner</u>, 646 F.3d at 558. And here, the ALJ addresses the substance of each factor. For instance, he recounts Lumley's pain symptoms as Lumley described them at hearing, and notes the techniques, such as lying down, that relieved his pain. <u>See</u> <u>id.</u> at p. 36. In recounting Lumley's medical history, the ALJ discusses the medication recommended by various doctors – in this case, almost entirely injections – and notes the degree of relief reported. <u>See</u> <u>id.</u> at 36-38. The ALJ pays particular attention to Lumley's somatic pain disorder, acknowledging that the non-severity of the condition "does not make the claimant's complaints of pain any less." <u>Id.</u> at 38. His analysis of these factors is sufficient.

The final <u>Polaski</u> factor is given as "functional restrictions." Notably, none of Lumley's treating providers ever suggested a functional restriction. The ALJ does, however, cite the functional restrictions of the State agency medical consultants, explaining that he accepts that Lumley is capable of working a reduced range of light work activity, but disagreeing with one of the consultants who suggests a two-hour limitation on standing and walking. <u>See</u> <u>id.</u> at 39. The ALJ also considers Lumley's own statements as to his functions, as expressed above.

Overall, the Court finds the ALJ's treatment of the <u>Polaski</u> factors sufficient. The ALJ considered Lumley's pain, noted that he still completed some activities of daily living, considered functional restrictions, and also noted that his medical treatment was conservative. Notably, on this record, there was not a great deal of medication to consider. At least as of 2014, Lumley was apparently not even using over-the-counter medications on a regular basis, telling Lori Klabunde that "he is not using anything in particular for pain." (Doc. No. 10-8, p. 31).

### 4.      Conclusion as to subjective complaints

Based on the above analysis, the Court finds that the ALJ properly considered the necessary factors in his analysis of Lumley's subjective complaint. As recognized by the ALJ, the evidence here shows sporadic attempts by Lumley to obtain medical care, mostly minimal diagnostic findings, conservative treatment, and that Lumley, by his own testimony, still completes some activities of daily living. As such, "the evidence as a whole" is not consistent with Lumley's testimony of debilitating pain and dysfunction, and so it is permissible for the ALJ to decline to credit Lumley's complaints. See Julin, 826 F.3d at 1086. The ALJ gave "good reasons" for his conclusions that Lumley's subjective complaints were "not entirely consistent with the medical evidence and other evidence of record," and the Court finds that deference to the ALJ is proper on this issue. The ALJ's conclusions regarding Lumley's subjective complaints are supported by substantial evidence on the record as a whole.

### B.      Whether the ALJ failed to develop the medical record

### 1.      Arguments of the parties

Lumley contends that the ALJ should have contacted the treating and evaluating physicians "when he questions their records," or obtained the testimony of a medical expert. (Doc. No. 18, p. 6). He also argues that the ALJ should have ordered an evaluation about his "emotional and mental health issues." Id.

The Commissioner responds by summarizing the relevant case law, noting that it is Lumley's burden to prove his disability and the ALJ only has the duty to develop a reasonably complete record. The Commissioner argues that the record in this case, containing hearing testimony, medical provider notes, consultative examinations, and State agency physicians'

opinions, was sufficient to support the ALJ's findings. The Commissioner also points out that Lumley did not ask the ALJ to obtain additional evidence at the hearing where he was represented by counsel. Citing Eighth Circuit law that only some medical evidence must support an RFC determination, and detailing the evidence present in this case, the Commissioner argues that the medical evidence here was more than sufficient to support the ALJ's decision.

### 2.    Governing law

An ALJ's duty to develop the record "fairly and fully, independent of the claimant's burden to press his case" is well established. <u>Vossen v. Astrue</u>, 612 F.3d 1011, 1016 (8th Cir. 2010), citing <u>Snead v. Barnhart</u>, 360 F.3d 834, 838 (8th Cir. 2004). Yet it remains the claimant's burden to show disability and demonstrate RFC. <u>Vossen</u>, 612 F.3d at 1016, citing <u>Stormo v. Barnhart</u>, 377 F.3d 801, 806 (8th Cir. 2004). The ALJ is under no obligation to "seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped." <u>Id</u>. Similar considerations govern an ALJ's duty to order medical examinations and tests:

> While an ALJ should recontact a treating or consulting physician if a critical issue is undeveloped, the ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled.

<u>Martise v. Astrue</u>, 641 F.3d 909, 926–27 (8th Cir. 2011) (internal quotations omitted) citing <u>Johnson v. Astrue</u>, 627 F.3d 316, 320 (8th Cir. 2010).

Regarding the RFC itself, an RFC "is a medical question" and "an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." <u>Mabry v. Colvin</u>, 815 F.3d 386, 390 (8th Cir. 2016), citing <u>Cox v. Astrue</u>, 495 F.3d 614, 619 (8th Cir. 2007). Yet, "an ALJ is not limited to considering medical evidence

exclusively." <u>Cox</u>, 495 F.3d at 619, citing <u>Lauer v. Apfel</u>, 245 F.3d 700, 704 (8th Cir.2001) and <u>Dykes v. Apfel</u>, 223 F.3d 865, 866 (8th Cir.2000) (per curiam). Medical records, physician observations, and the claimant's subjective statements about his capabilities may be used to support the RFC. <u>Partee v. Astrue</u>, 638 F.3d 860, 865 (8th Cir. 2011). The RFC determination is "ultimately an administrative determination reserved to the Commissioner." <u>Mabry</u>, 815 F.3d at 390, citing <u>Cox</u>, 495 F.3d at 619-20.

### 3.    Analysis

The Court first notes that some of Lumley's contentions are largely inapplicable to the facts here. For instance, he writes that the ALJ "should have contacted the treating and evaluating physicians when he questions their records, or at least, obtained testimony of a Medical Expert."[3] Unfortunately, Lumley fails to cite to the record in support of this contention. And the undersigned is hard-pressed to find *any* instance where the ALJ "questioned the records" of a treating or examining physician. The closest he comes to questioning a record is his disagreement with one of the State agency consultants regarding Lumley's limitations on standing and walking. One of the consultants, Dr. Marcus Fiechtner, wrote that Lumley could stand and walk for a total of two hours in a given workday. <u>See</u> Doc. No. 10-4, p. 10. The other consultant, Dr. Thomas Christianson, wrote that Lumley could stand and walk for a total of four hours in a workday. <u>See</u> Doc. No. 10-4, p. 23; Doc. No. 10-4, p. 35. The ALJ determined that Lumley has the RFC to stand and walk for four hours, explaining that based on his testimony and stable COPD symptoms, he did not believe the limit of two hours was appropriate. Even setting

---

[3] Relatedly, Lumley asserts "[H]e is unable to engage in substantial gainful activity, as affirmed by his treating and evaluating physician." (Doc. No. 18, p. 3). Nowhere in the

aside that Dr. Christianson recommended a four-hour limitation, the ALJ relied on the evidence of record in formulating this particular condition of the RFC. The undersigned does not find that this issue was "underdeveloped" such that the ALJ should have contacted Dr. Fiechtner or obtained the testimony of a different medical expert.

Lumley also argues that the ALJ should have "ordered and obtained an evaluation and opinion about Mr. Lumley's emotional and mental health issues." (Doc. No. 18, p. 6). Notably, Lumley did undergo a psychological examination with Dr. Eaton on October 23, 2015, based on a referral from the Social Security Administration. See Doc. No.  10-9, p. 82-84. While the purpose of this evaluation was to assess his "mental status and memory functioning," as opposed to emotional and mental health, Dr. Eaton does address emotional health in his opinion, writing that Lumley "has never been treated for mental health reasons or any substance abuse problems," and that Lumley "denies any significant emotional distress other than his frustration with his current work situation." Id. at 82.  Dr. Eaton concludes by noting that "there is also no evidence of significant emotional distress at present." Id. at 84.

Here, the ALJ did not fail in his duty to develop the record by declining to order another evaluation centered on Lumley's emotional and mental health. Nothing in the medical records indicates that Lumley sought care for emotional and mental health problems. Lumley did not claim mental health issues (beyond allegations of memory problems) or emotional distress in his application for disability. When asked in his functional report how well he handled stress, Lumley wrote, "better than most, [worse] than others." (Doc. No. 10-7, p. 61). He alludes to feeling "stressed out" at his hearing, but admits he is not receiving any mental health treatment.

administrative record does any physician, treating or evaluating, render such an opinion.

See Doc. No.  10-3, p. 18. The consultative examiner specifically concluded that Lumley did *not* show evidence of significant emotional distress. Lumley's vague contention at this late stage that further assessment is needed of his newly-claimed mental and emotional problems is unavailing. It is *his* burden to show disability and demonstrate RFC. Vossen, 612 F.3d at 1016. While an ALJ does have a duty to develop the record, this duty is not never-ending and an ALJ is not required to disprove every possible impairment. McCoy v. Astrue, 648 F.3d 605, 612 (8th Cir. 2011), citing Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir.1994). Nothing about Lumley's claims of mental and emotional health rises to the level of a "crucial issue that is underdeveloped," and as such, the ALJ's failure to order further evaluation did not violate his duty to develop the record.

Further, the Court finds Lumley's broad criticisms of the RFC determination unavailing. As the ALJ explains in detail, his RFC is based on an analysis of the treating records from numerous physicians, the opinions of the State agency consultants, the records of two examining physicians, as well as non-medical evidence like Lumley's functional reports and hearing testimony. The Court finds that the ALJ's RFC determination was well-supported by substantial evidence.

**C.     Whether the ALJ erred by not finding Lumley disabled pursuant to GRID Rule 201.12**

**1.     Arguments of the parties**

Lumley argues that, upon turning 50 on August 17, 2017, he meets the guidelines for disability pursuant to GRID Rule 201.12 because the vocational expert ("VE") did not identify any transferability of skills to less than medium exertion. Lumley also criticizes the ALJ's

hypothetical questions to the VE at the hearing, contending that they failed to present a true picture of Lumley's limitations.

The Commissioner responds that the ALJ's hypothetical to the VE was proper because it relied on his RFC determination, which is itself properly supported. Citing law that an ALJ need only include limitations in a hypothetical that the finds established in the evidence, the Commissioner contends that the VE's response regarding the availability of jobs for Plaintiff to perform was supported by substantial evidence.

Regarding Lumley's specific contention regarding Grid Rule 201.12, the Commissioner explained that Lumley's RFC allowed him to do a limited range of light work, as opposed to only sedentary work. The Commissioner argues that Grid Rule 201.12 only applies to individuals limited to sedentary work, and as such, does not apply in Lumley's case.

### 2.    Governing law

The Medical-Vocational Guidelines, or Grid Rules, are "are a set of charts listing certain vocational profiles that warrant a finding of disability or non-disability." Phillips v. Astrue, 671 F.3d 699, 702 (8th Cir. 2012), citing McCoy v. Astrue, 648 F.3d 605, 613 (8th Cir.2011). If the ALJ's findings as to vocational profile – i.e., RFC, age, education and work experience – match the combinations of criteria contained in a particular Grid Rule, then "the ALJ must reach the conclusion (either 'disabled' or 'not disabled') directed by the relevant Rule or line of the applicable Table." Phillips, 671 F.3d at 702, citing Reed v. Sullivan, 988 F.2d 812, 816 (8th Cir. 1993).

Grid Rule 201.12 dictates that persons limited to sedentary work, ages 50–54, and who are high school graduates and have unskilled work experience, are presumptively disabled. 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 201.12.

The Social Security Administration's Program Policy Statement SSR 83-12 gives adjudicative guidance for use of the Grid Rules. See generally SSR 83-12 (1983). SSR 83-12 specifically addresses those situations where an individual's RFC does not fall neatly into any one of the exertional ranges, i.e., sedentary, light, or medium. Id. SSR 83-12 explains that when an RFC "does not coincide with the exertional criteria of any one" of the ranges, then the Grid Rules *do not* direct a conclusion of disability or non-disability. Id. In such a case, the ALJ must assess the occupational base. Id. If "the extent of erosion of the occupational base is not clear," an ALJ will need to consult a vocational resource, such as a vocational expert. Id. SSR 83-12 specifically mentions the situation where an individual's exertional limitations are "in the middle" of two exertional ranges, suggesting vocational assistance in these cases. Id.

### 3.   Analysis

Here, the ALJ specifically addressed the Grid Rules and SSR 83-12, as well as the other relevant law. He notes that if Lumley had the RFC to provide the full range of light work, a finding of "not disabled" would be mandated by the Grid Rules. But here, Lumley's RFC only allows for a *limited* range of light work. As such, the ALJ explains, he consulted a vocational expert to ascertain the "extent to which these limitations erode the unskilled light occupational base." (Doc. No. 10-2, p. 41).

Lumley contends that Grid Rule 202.12 applies, which mandates a finding of "disabled." Partially his argument seems to be that the ALJ mis-determined his RFC, which should be

"sedentary." If indeed Lumley's RFC were determined to be sedentary, then with his age, education, and previous work, he may indeed be found disabled under Rule 202.12 (setting aside considerations of whether his limitations are non-exertional, which is also a factor in determining whether the Grid Rules apply).

But Lumley's RFC is not sedentary. As explained above, the ALJ's RFC determination – limiting him to less than a full range of *light* work – is supported by substantial evidence. And even though his RFC is, in a sense, *between* light and sedentary, there is simply no mandate that in such a situation the sedentary Grid Rule must apply. Rather, in such situations, an ALJ is permitted to seek vocational advice, which the ALJ did in this case. See, e.g., Haynes v. Barnhart, 416 F.3d 621, 628 (7th Cir. 2005) (where claimant's RFC fell between light and sedentary exertional levels, ALJ was not required to simply apply "sedentary" Grid Rule).

Lumley also contends that the use of a four-hour limitation on standing and walking "is more accurately a sedentary RFC." (Doc. No. 18, p. 8). He does not explain further or cite any law. Looking to 20 C.F.R. § 404.1567, sedentary work is defined in part: "Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required *occasionally* and other sedentary criteria are met." 20 C.F.R. § 404.1567 (emphasis added). It is unclear to the undersigned how standing and walking four hours out of an eight hour work day – i.e., fully half of the workday – could properly be categorized as "occasional." Lumley's contention is without merit.

Finally, Lumley criticizes the hypotheticals given to the vocational expert relied upon by the ALJ. He contends that his attorney's hypotheticals, including frequent breaks and shifting

positions with 15 minutes, were "full and fair" and should have been relied upon by the ALJ. (Doc. No. 23, p. 1). But the ALJ did not find these hypotheticals to accurately characterize Lumley's RFC. "The hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole." Lacroix v. Barnhart, 465 F.3d 881, 889 (8th Cir. 2006), citing Hinchey v. Shalala, 29 F.3d 428, 432 (8th Cir.1994). And this Court has already concluded that the ALJ's conclusions about Lumley's limitations are supported by substantial evidence on the record as a whole.

IV.    **CONCLUSION**

Having carefully reviewed the record as a whole and the parties' arguments, the Court concludes that the ALJ's decision is supported by substantial evidence and is within the applicable "zone of choice."  For the above reasons, Lumley's Motion for Summary Judgment (Doc. No. 17) is **DENIED** and the Social Security Administration's Motion for Summary Judgment (Doc. No. 20) is **GRANTED**.

**IT IS SO ORDERED.**

Dated this 26th day of July, 2021.

_/s/ Clare R. Hochhalter_
Clare R. Hochhalter, Magistrate Judge
United States District Court